## RICHARDS *v.* PIEFER.

WILLS—WITNESS IN WILL CONTEST CASE DOES NOT FORFEIT BEQUEST AS CONTESTANT.

That a beneficiary under a will voluntarily appeared in the circuit court as a witness for the contestant of the will, after having been informed that she could be compelled to testify and that if the contest was successful she would lose her bequest, where she had no notice of the contest in the probate court, and took no part in the case on appeal other than as a witness, *held*, insufficient to bring her within a clause of the will providing that any one attempting to set aside the will should not receive to exceed one dollar from the estate.[1]

Appeal from Antrim; Mayne (Frederick W.), J. Submitted October 16, 1924.    (Docket No. 106.)    Decided January 28, 1925.

Bill by William H. Richards, executor of the last will of Emily Grace Browne, deceased, against Gertrude Ingersoll Piefer and others for a construction of said will.    From a decree for plaintiff, defendant

---

[1]Wills, 40 Cyc. p. 1721.

As to what constitutes contest or attempt to defeat will within provision thereof forfeiting share of contesting beneficiary, see note in 5 A. L. R. 1370.

Piefer appeals.    Reversed, and decree entered for appellant.

*Clink & Williams,* for plaintiff.

*Patchin & Duncan,* for appellant.

Moore, J.    In August, 1920, Emily Grace Browne made her will.    She died January 9, 1921.    Her will was contested.    The case found its way into this court.    It is reported in 217 Mich. 621.    The will contained the following provisions:

"3. I give, devise and bequeath to my cousin Gertie Ingersoll Piefer of Wilmette, Illinois, the sum of five thousand dollars, absolutely.

"4. I give, devise and bequeath to my respected friend and attorney Clayton L. Bailey, the sum of five thousand dollars, absolutely.

"5. I give, devise and bequeath to my half sister, Anna Bell Jones of Chicago, Illinois, the sum of five dollars, absolutely, she having already received from me a large amount from the properties left to me by our father. * * *

"7. It is my further will that in the event of any person claiming relationship to me or otherwise, shall attempt to set aside this will, or contest the same on any grounds, that such person shall receive from said estate not to exceed the sum of one dollar, and this shall apply not only to the person who may directly attack or contest the validity of this instrument, but also to any and all persons whom such contestant shall represent in any fiduciary capacity or otherwise.

"8. All the rest, residue and remainder of my property and estate, both real and personal, of every kind and nature, whatsoever situate, of which I die seized or possessed or to which I may be entitled to at the time of my decease, I give, devise and bequeath to the above named Clayton L. Bailey, his heirs, representatives and assigns forever, in fee simple, and absolutely."

Mr. Bailey was a lawyer living at Bellaire, Michi-

gan. He was not related to Mrs. Browne but she had been an inmate of his family for about a year and a half before she died. He and his family had been very kind to Mrs. Browne, and she was very grateful for their kindness. The half sister, Anna Bell Jones, contested the will which was allowed in the probate court. She appealed to the circuit court where the will was again allowed, when she brought the case into this court where the will was sustained. Mrs. Piefer was a witness upon the trial in the circuit court called by Mrs. Jones.

The bill of complaint in the instant case was filed upon the theory that because of her activities in the will contest Mrs. Piefer forfeited the legacy under paragraph 3, because of the provisions of paragraph 7. The circuit judge found a forfeiture as claimed, and Mrs. Piefer has brought the case into this court.

Mrs. Piefer was called in the instant case by the plaintiff as an adverse witness and was subjected to a very long and exhaustive examination which when analyzed showed that she had known Mrs. Browne and Mrs. Jones many years, and was very friendly with both of them; that she did not attend the funeral of Mrs. Browne because she did not know of the death until after the funeral had been held at Bellaire, Michigan, where Mrs. Browne died, while Mrs. Piefer lived in Chicago. Her testimony showed that the bequest to her was a surprise and that she did not know the will was contested or was to be contested until after it was allowed in probate court. The testimony shows she was interviewed by the husband of Mrs. Jones and told him what she knew of the relations between Mrs. Browne and Mrs. Jones, and of the affection Mrs. Browne had expressed to her for Bernice, the daughter of Mrs. Jones. At the request of Mr. Jones she met him at a lawyer's office in Chicago and told the lawyer substantially what she had told Mr.

Jones.    She was informed by the lawyer that if the will contest was successful she would lose her legacy. She was also told by him that she could be compelled to give her testimony.    Later she appeared with other witnesses in a Chicago office for the purpose of giving her deposition.    No subpœna was served upon her.    The noon hour came before she was reached as a witness and it was suggested that instead of giving her deposition she go to Michigan as a witness, and she afterwards did this without any subpœna having been served.    Either she or her husband paid her expenses of going to Michigan, but she testified this was done in the expectation that she would be reimbursed, and that her expectation in that regard was met.

Counsel lay great stress upon the fact that she went to the office of the Chicago lawyer and came to Michigan as a witness without process having been served upon her, coupled with the fact that she admitted on her examination that her sympathies were with Mrs. Jones instead of with Mr. Bailey.

There were three persons who knew what Mrs. Piefer's activities were, and we quote some of their testimony.    First from Mrs. Piefer's testimony:

"I didn't come up to the funeral, she was buried before I knew.    I did not know of her death before the funeral.

"Q. Now, in February, Mrs. Anna Bell Jones filed a petition or notice of contest of the will of Emily Grace Browne in the probate court for this county?

"A. Yes.

"Q. Did she or any one in her behalf confer with you in regard to filing that contest before she did so?

"A. No, sir.

"Q. What part did you have, if any, in preparing Mrs. Jones' case to contest the will?

"A. None at all, whatever.

"Q. Who, if anyone had consulted with you in regard to the contest before it was started?

"A. No one at all.

"*Q.* After this contest was filed in the probate court, what part did you take in contesting the will in probate court?

"*A.* None.

"*Q.* Were you present there as a witness at the probate court when the will was contested in the court?

"*A.* No, I did not even know that it was contested down there.

"*Q.* Then Mr. and Mrs. Jones or anybody else hadn't notified you that they were fighting it in the probate court?

"*A.* No, sir.   *   *   *   My husband and Mr. Jones agreed upon the day and I went to Mr. Cattell's office in Chicago on that day.   *   *   *

"*Q.* Then you say that Mr. Cattell and Mr. Jones asked you what you could swear to, there at Mr. Cattell's office?

"*A.* If I would be willing to give my testimony.

"*Q.* As to your relationship to Mrs. Browne and what you knew in regard to her?

"*A.* Yes, sir.

"*Q.* Well, at that time did they go over any facts of your acquaintance or your relations with each other, did they talk that over some while you were there?

"*A.* Yes, sir.   They asked what I would be willing to testify to, and we went over in substance what I knew in relation to them and Anna Bell Jones.   *   *   *   I was pretty well acquainted with their relationship from the time they were little girls right up. Mr. Cattell, Mr. Jones and I went over that together more or less.   When they asked me if I would be willing to testify I told them I would.

"*Q.* Was anything said there as to where you would give your testimony or as to depositions, in the first talk?

"*A.* Yes, at first they said that they could compel me to give my testimony.

"*Q.* Then what was said?

"*A.* I said it wouldn't be necessary to do that.   *   *   *

"*Q.* Well, how did it happen that you did not give your depositions there that day?

"*A.* Well, they were taking the depositions and it came noon and I went out for lunch and we came back and they asked me if I would be willing to give my testimony.

"*Q.* In court, you mean?

"*A.* Yes, sir.

"*Q.* Who asked you that?

"*A.* Mr. Jones.

"*Q.* What did you tell him?

"*A.* I said I would.  *  *  *

"*Q.* When Mr. Jones asked you to come up here what was said about paying your expenses?

"*A.* Nothing.  *  *  *

"*Q.* Nothing was said about your expenses?

"*A.* No, nothing.    I learned from my husband that Mrs. Jones was going and what train to meet her on. After I got here to attend this trial I stayed here one week.    Mr. Jones stayed at Fisherman's Paradise.

"*Q.* Who was with him?

"*A.* Mrs. Jones, Mr. Cattell and, I think, yourself.

"*Q.* How much did you pay for your keep there at Dr. Hinman's?

"*A.* We were their guests.

"*Q.* Did you pay them anything yourself?

"*A.* No, sir.  *  *  *

"*Q.* Do you know whether Dr. and Mrs. Hinman were paid for your staying there or not at the Hinman home?

"*A.* I was told that they received a check.

"*Q.* But they didn't charge you anything, nor you didn't pay anything?

"*A.* No, sir.

"*Q.* When you came up here to Bellaire to attend this trial and when you went back home you paid your expenses on the road at that time?

"*A.* My husband bought me a ticket and gave it to me.

"*Q.* And when you came back, who bought your ticket?

"*A.* I did.  *  *  *

"*Q.* State whether or not you were ever reimbursed for the expenses of your fare there and back.

"*A.* I was.

"*Q.* Who paid them?

"*A.* Mr. Jones.  *  *  *

"*Q.* Now, when Mr. Jones was getting up this case to fight here in circuit court, what did you have to do with preparing the case for trial?

"*A.* Nothing.

"*Q.* State whether or not you had any talk with Mr. Jones except as to what you knew of the relationship between Emily Browne and Ann Jones?

"*A.* That was all.

"*Q.* What, if anything did you have to do with paying their attorneys?

"*A.* Nothing at all.

"*Q.* What, if anything did you have to do with paying their witnesses?

"*A.* Nothing at all.

"*Q.* What, if anything did you have to do with counseling them in the case?

"*A.* I never asked them any questions.

"*Q.* Or gave them advice as to how to proceed?

"*A.* I never did that.

"*Q.* What assistance did you ever offer them to help them take care of this suit, prosecute the case?

"*A.* None.

"*Q.* State whether or not you ever telephoned to Mr. and Mrs. Jones or their attorneys tendering your services as witness before they requested them.

"*A.* I never did.

"*Q.* Whatever you did, then, it was at the request of Mr. or Mrs. Jones?

"*A.* Yes, sir.   *   *   *

"*Q.* State whether or not you expected to be reimbursed when you came up here?

"*A.* I did."

The Chicago attorney testified in part, speaking of Mrs. Piefer:

"I told Mrs. Piefer that I wanted to ask her some questions about the family history of Emily Grace Browne and the relations between Mrs. Jones and Emily Grace Browne if she knew anything about those relations, and at the same time I said to her, 'That is what I want to ask you, but before you answer me or talk with me further, you should consult with an attorney.' I said, 'I can take your deposition here before a commissioner and I can compel your attendance before the commissioner but I would like to know before having a *dedimus* issued whether your testimony will be of any use to me.'   *   *   *

"*Q.* Now, Mr. Cattell, in preparing Mrs. Jones' case

here in Chicago, what, if anything, did Mrs. Piefer have to do with preparing the case or assisting you in getting the material together for the trial?

"A. Nothing.

"Q. What, if any, suggestions did she ever make to you as to preparing for the case or assisting you in getting ready?

"A. Nothing—I did not ask her.

"Q. She did not volunteer?

"A. No.

"Q. Did Mrs. Piefer ever pay any part of your expenses or your legal services in the matter?

"A. No, sir.

"Q. Who did pay them?

"A. My recollection is that Mr. Jones paid them."

Mr. Jones testified:

"Q. Now, Mr. Jones, what, if anything, did Mrs. Piefer have to do with you in helping to prepare for the trial of this suit?

"A. Nothing whatsoever.

"Q. What, if any, part of the expenses of contesting this will were paid by Mrs. Piefer?

"A. Mrs. Piefer had nothing whatsoever to do with paying the expenses.

"Q. What, if anything, had she to do with the employment of attorneys?

"A. Nothing whatsoever.

"Q. What, if anything, did she do in helping you prepare for the contest of the will?

"A. Nothing."

Mrs. Jones testified to the same effect.

It is urged that Mrs. Piefer talked with a woman juror and the plaintiff called the juror as a witness. She said in substance that she was introduced to Mrs. Piefer in the lobby of the court house and she sat down by the side of Mrs. Piefer.

"Q. What occurred when he introduced you?

"A. We sat down—I sat in his place and he went away.

"Q. And during your conversation—it was about lodge?

"*A.* Yes, practically.

"*Q.* On how many occasions did you talk about lodges with her?

"*A.* Twice that I remember.

"*Q.* Did sheriff Andrew Dunsmore interfere at any time?

"*A.* Yes.

"*Q.* And he told you not to talk with her or not to talk with the witness?

"*A.* Yes, sir.

"*Q.* Was there any talk about Mrs. Jones between you and Mrs. Piefer?

"*A.* No, none."

Her testimony shows that Mrs. Piefer did not seek the interview and that nothing was said relating to the case.

Plaintiff produced a witness who was a witness on the will contest, who testified in the instant case in part as follows:

"At that time I saw Mrs. Jones to know who she was, and I also saw Mrs. Piefer to know who she was. After I left the court room and started for my home I saw those two ladies on the train. I got on at Mancelona and they were on the train then.

"*Q.* Did you hear any conversation between those two ladies?

"*A.* I did.

"*Q.* What was said in relation to the contest of this will in question?

"*A.* They were talking of the case and one of them said, 'They will find this suit has just begun—this fight has just begun,' and the other one said, 'they surely will.'    And I thought it was ended—

"*Mr. Patchin:* Wait, I ask that the last part of the answer be stricken out.    'I thought it was ended.'

"*The Court:* That part is stricken out.

"(Witness continuing): One of those people was Mrs. Piefer, the one who either made the first remark or the answer."

Mrs. Piefer testified she had no recollection of such a conversation.

The testimony is positive that Mrs. Piefer had no notice there was to be a contest until after the will was allowed in probate; that she was not instrumental in any way in bringing about a contest, that she did not in any way advise a contest, that she took no part in paying any part of the expenses of a contest. Her offense seems to be that she was a witness without being formally subpœnaed, though she was told she could be compelled to testify, and admitted that she would like to have Mrs. Jones, a half sister of the deceased, win, instead of having one who was not related to Mrs. Browne take over her very considerable estate.

This court has never had before it a case similar to the instant case, and the diligence of counsel has not enabled them to produce an authority on all fours with the instant case, though the case of *Haradon* v. *Clark*, 190 Iowa, 798 (180 N. W. 868), is nearly so. See, also, *In re Bergland's Estate*, 180 Cal. 629 (182 Pac. 277, 5 A. L. R. 1363). We think the record does not bring Mrs. Piefer within the seventh paragraph of the will.

The decree of the court below is reversed, with costs to the appellant, and one will be entered here in accordance with this opinion.

MCDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.